## J. W. REEDY ELEVATOR MANUFACTURING CO. v. PECK.

1. MECHANICS' LIENS—CONTRACTS — PERFORMANCE — EVIDENCE — SUFFICIENCY.

On a bill to enforce a mechanics' lien for furnishing and installing a hydraulic elevator in defendant's hotel, evidence examined, and *held*, to show that defendant performed her contract to furnish a water pressure of 80 pounds per inch, and to show that complainant did not perform its guaranty to furnish a pressure relief attachment such that the pressure in the city water mains would not vary to exceed five pounds per square inch when the elevator was stopped, which was the inducing cause of defendant's entering into the contract.

2. SAME—CONTRACTS—NONPERFORMANCE—RECOUPMENT.

Though the mechanics' lien law expressly provides that the owner "shall be entitled to recoup any damages which he may sustain by reason of any failure or omission in the performance of such contract" (section 10710, 3 Comp. Laws), a decree awarding complainant a lien for the contract price less defendant's damages is not warranted by the pleadings where no such issue is presented by the answer, and no amendment was asked or ordered as authorized by section 10736, 3 Comp. Laws; and it appearing from the proofs that complainant failed in performing its contract, the bill should be dismissed.

149 MICH.—42.

Appeal from Emmet; Shepherd, J. Submitted June 19, 1907. (Docket No. 65.) Decided October 4, 1907.

Bill by the J. W. Reedy Elevator Manufacturing Company against Blanche T. Peck and others to enforce a mechanics' lien. From the decree rendered, complainant appeals. Modified and affirmed.

*Carroll, Kirwin & Hollway*, for complainant.

*C. J. Pailthorp*, for defendants.

BLAIR, J. This suit was commenced by bill in equity to establish and foreclose a mechanic's lien claimed to be due for installing a hydraulic elevator in the defendant's (Blanche T. Peck's) hotel at Petoskey. The defendant Blanche T. Peck entered into a contract with complainant for the installation of the elevator, the portions of which material to the present inquiry are as follows: Complainant agreed—

" To furnish and erect in your building known as the Arlington Hotel at Petoskey, Mich., one of our best and latest improved high speed safety passenger elevators, to be operated by water pressure obtained from the city main, 80 lbs. per square inch pressure. * * * The elevator will have a lifting capacity of 1,500 lbs. exclusive of the weight of the car, and have a maximum speed of 200 feet per minute with a load of 750 lbs. * * * The valve will have a 4-inch supply and 4-inch exhaust. * * * The supply pipe to cylinder to be 4-inch diameter. The exhaust pipe to be 4-inch diameter. * * * The above price also includes one of our latest improved pressure relief attachments, erected in building complete, you to make pipe connections to same. With this device of attachment, we will guarantee that the water pressure in the city mains will not vary to exceed 5 pounds to the square inch when the elevator is stopped."

Complainant alleged that the contract had been fully carried out upon its part and that the contract price had become due and payment refused. The defendant Blanche T. Peck, by her answer, admitted the contract

as set forth, but denied that complainant had performed the contract, alleging, among other things, that when the elevator would stop, the pressure in the city mains varied from 30 to 60 pounds.

"And in consequence of said variation and the danger incident therefrom, the city authorities refused and still refuse to allow said defendants or any of them to use sufficient water to operate said elevator; and these facts have been repeatedly brought to the attention of said complainant by said defendants, with the request that said complainant carry out its said agreement with the said defendants by equipping said elevator so that when operated by water taken from the said city mains with a water pressure that shall not vary to exceed 5 lbs. to the square inch when said elevator is stopped, said elevator shall have a lifting capacity of 1,500 lbs., exclusive of the weight of the car, and have a maximum speed of 200 feet per minute with a load of 750 lbs., and that said complainant had neglected and refused to so equip said elevator without an additional compensation of several hundred dollars, which said defendants declined to pay.

"The said defendants, further severally answering, allege that said elevator has been and is a source of great annoyance and damage to said defendants, and that in its present condition, and the condition in which it was left by said complainant, it is of no value to said defendants or either of them; and that said elevator has never been accepted by said defendants or any of them. They severally deny that they or either of them are indebted to said complainant in any sum whatever. They severally deny that said complainant was or is entitled to a lien on the property described in complainant's bill of complaint or any portion thereof."

The decree contains, among other things, the following findings of fact by the circuit judge:

"There is considerable variance in the testimony of witnesses as to the extent of the disturbance in the city water mains caused by the operation of the elevator in question; but all agree that the pressure in the city water mains varied much more than the five pounds to the square inch when the elevator was stopped, resulting in what some of the witnesses called a 'water-hammer,' caused partly by the sudden stoppage of the flow of water

from the city reservoir and partly by the momentum of the machinery at the pumping station. The use of the elevator, while carrying its load, of so large a quantity of water from the mains, caused the machinery to increase its speed very much, and this machinery being operated by water power was very heavy, and the inertia correspondingly great. The machinery did not, of course, cease this rapid motion instantaneously upon shutting off the water at the elevator valve, thereby causing a great increase of pressure, resulting in weakening and bursting of mains, loosening of joints and packing, and various other disturbances; so the city refused to allow defendant to continue the use of the elevator except by cutting off the supply of water to about one-fifth the 4-inch opening stipulated in the contract, lessening thereby very much its capacity.

"Complainant claims it was the duty of the defendant under the contract to furnish enough water and under sufficient force to maintain a constant pressure of 80 pounds per square inch. That if this had been done, there would have been no 'water-hammer.'

"Defendants say that if they agreed to anything it was merely to furnish the water in the 4-inch opening under pressure of 80 pounds at the instant of starting the elevator.

"From the view I take of the case, it is immaterial which party was in default, or rather, which, if either party, agreed to maintain the constant pressure of 80 pounds. I am not satisfied from the evidence that the 'water-hammer' so-called, was caused by such default. It seems to me to have been more the result of the peculiar construction of the water works. This elevator while fully loaded consumed a large portion of the entire capacity of the pumps. Even if the pressure was maintained, the sudden closing of the valve would, under the circumstances, cause a rise in pressure much beyond the capacity of the device provided, and which absorbed only a few gallons of water.

"Complainants made their proposal with knowledge of the peculiar construction of the city water works plant. So I find that complainant has failed to furnish such an elevator as the contract required it to furnish, and defendants may set off or recoup from the contract price of the elevator their damages for breach of warranty."

Previous to the making of the contract in question,

trouble had arisen from the use of a hydraulic elevator in another hotel in Petoskey known as the Imperial Hotel, and had disclosed the fact that, owing to extreme and sudden changes in the pressure in the water mains, the operation of a hydraulic elevator with water taken directly from the mains was attended with danger to such mains and the pumping machinery. At the time of executing the contract, and for several years prior thereto, there was and had been an ordinance adopted by the common council prohibiting the operation of hydraulic elevators in the city with water taken directly from the city mains.

After a careful consideration of all the testimony in the record, we agree with the circuit judge that the entire situation was explained to and understood by the complainant's agent, Rice, at the time of making the contract with defendant Blanche T. Peck. In consequence of the objections of the superintendent of the city water works and board of public works that the installation of the elevator would endanger the pumping machinery and water mains, complainant's agent, Rice, consulted with said superintendent and board of public works and assured them, as well as defendant Blanche T. Peck's husband, who was the manager of the hotel for her and represented her in making the contract, that this difficulty would be obviated by the appliance which he proposed to attach to the elevator. These assurances led the public authorities to consent to the installation of the elevator in the Arlington Hotel and induced the defendant to enter into the contract.

The superintendent of the water works testified as to the results after the water was first turned on to operate the elevator in question.

"After I turned on the water I returned to the water works as soon as I could get there.
"*Q.* Well, what, if anything, did you notice after you got to the water works?
"*A.* Why, we had a great variation of pressure. I

was afraid of a damage to the pumps and went right back and turned it off again.

"*Q.* What was the variation?

"*A.* Well, while that valve was wide open, there was about 50 or 60 pounds at the works.

"*Q.* Did that variation take place when the elevator was stopped?

"*A.* When it was started and stopped both.

"*Q.* Both?

"*A.* Yes, sir.

"*Q.* Well, would there be any difference in the variation in the pressure at starting or at stopping?

"*A.* The starting was not injurious because it decreased the pressure, but the stopping was injurious because it increased it.

"*Q.* So that the injury came from the stopping of the elevator?

"*A.* Yes, sir.

"*The Court:* What variation?

"*Mr. Kirwin:* At the works.

"*Witness:* 50 or 60 pounds, depending upon the lift of the elevator. A short lift was not as bad as a long one.

"*Q.* That would indicate what? That there was that much variation in the pressure in the mains?

"*A.* Yes, sir.

"*Q.* What damage, if any, did this variation do to the property of the city?

"*A.* Caused leaks in the mains and damage to the pumps, through loosened balance wheels and couplings and gear wheels, blowing out valves and packing. * * * There was tests made at the elevator for the purpose of showing the difference in the pressure in the pipes in Mr. Dunn's presence; I don't remember of their saying anything about obviating except their relief appliances that they put in there which was of no value as far as I could see; they made a claim that it would do it, but it did not. While they were operating the elevator I went with members of the board about the city from point to point, for the purpose of testing the variation of pressure in the pipes at different points, viz., sill cocks at the Arlington Hotel, Imperial Hotel and Rose's yard above the Arlington across the railroad track, perhaps 340 feet on an even line; we found the variation to be at these different points, when the elevator was being operated, about the same as it was at the station, about 60 pounds if the

valve was open, but we seldom had the valve open, and we tried to hold it down to a variation of 20 pounds, that is, on the opening and closing of the valve.

"I remember Mr. Cook making some change in the construction or mode of operation of the elevator later, and the effect of the change was that it did away with the variation of pressure of 50 or 60 pounds and all our troubles as long as there was air in the tank; when there is air in the tank the variation of pressure is so slight that you could not notice it when they operated the elevator. * * *

"The location of the reservoir, stand pipe, was all gone over and he understood at that time it was a reservoir tank system here and he spoke about the St. Joe system and the elevator there in that connection, and in effect he said it was the small-pipe system in St. Joe and that the conditions there and the elevator they had installed was similar to the conditions here. * * * We went over the trouble with Mr. Rice, that we had with the other elevator, and we didn't want any more of it, so we guarded against it in this way. Mr. Rice guaranteed us we would have no trouble with this device, which I knew nothing . of.

" Q. Now after this elevator was installed and after it began operations, how long was it in operation before your attention was called, or any complaint made, or you noticed any trouble—anything wrong?

" A. How long after the valve was first opened ?

" Q. Yes.

"A. Just as fast as I could go from the Arlington Hotel to the pump station. * * *

" Q. When the elevator would begin its intake and begin to rise, there would be a decrease in pressure, would there ?

"A. Yes, sir.

" Q. And that would be, I suppose, simply while the elevator was rising ?

"A. And it would be very quick.

" Q. It would go down about how much ?

"A. Well, it dropped about 100 pounds or 95, depending upon the operator in the elevator a good deal.

" Q. It would drop from what pressure to what pressure ?

"A. From 125 with pumps running at normal speed—

" Q. To what pressure ?

"A. To 95. * * *

" *Q.* When the elevator would be stopped, what would be the effect?

"*A.* Run up to about 150 pounds pressure—sometimes 160—depending upon the operator."

In consequence of these conditions, the city authorities refused to permit the elevator to be operated with a 4-inch valve, fully open, but inserted in the valve a bushing, decreasing its capacity to between one-fourth and one-fifth of its full capacity, which obviated the difficulties experienced, but so lessened the supply of water that the elevator could not be operated in compliance with the contract. Later on, defendant installed, in connection with the elevator, a compression tank, at considerable expense, which enabled defendant to use the elevator with the valve fully open.

It is agreed that the elevator plant itself worked satisfactorily when the valve was wide open, and it is the contention of complainant's counsel that the failure of the elevator to do its work after its installation was wholly due to the failure of the city authorities to furnish sufficient water to maintain a constant pressure of 80 pounds to the square inch with valve wide open; that the object of the pressure relief attachment was to take care of the water-hammer, so-called, and that, with a sufficient supply of water, it would have done so. Complainant's superintendent, Forslund, testified:

" *Q.* Mr. Cook and Mr. Peck both testify that when the Arlington Hotel elevator began to rise there was also a rapid increase of motion in the pumps—a racing of the pumps. Now what would that indicate?

" *A. That would indicate that the pressure in the pipes was reduced clear up to the pump;* and this reduction of pressure shows that a large quantity of water —or a quantity of water had been withdrawn from the pipes which the pumps are not able to take care of in the same length of time, while the water was being withdrawn therefrom; and this reduction of pressure in the pipes caused the pumps to accelerate in motion, because they had less head or load to operate against. As soon as the pressure began to rise—or, return to its normal condition

—the pumps would not stop racing, on account of the momentum of its own parts. There is quite a fly-wheel on this shaft—the turbines themselves are of some size and weight, undoubtedly—and would tend to continue at the increased speed on account of their own momentum and before the pumps could return to their normal condition, the pressure would rise above the normal. And that was this reaction, which in my opinion is not a water-hammer—it is simply a pressure driven up by these pumps to a certain point, that caused the trouble; and it was this sudden reduction of pressure which we noticed when the elevator started up—or this reduction in the pressure in the pipes that would have a tendency to make this pump to clatter—the gears get noisy. I have noticed that on pumps that were geared with gears, that in drawing the water away from them, that even if they could not increase in speed—if the governing device was such that they could not increase in speed—they would clatter anyhow.

" *Q.* Is this relief attachment designed to take care of that falling pressure caused by the withdrawal of the supply?

" *A.* No, sir. As I said, that relief attachment could not supply any additional pressure and it was incapable of supplying water to the system.

" *Q.* It was designed to take care of—

" *A.* Of the shock or water-hammer due to the momentum of the column of water at the elevator when the elevator was suddenly shut off—absorb the inertia—we might say, of the flow of water in that direction."

Speaking again of the pressure relief attachment, Mr. Forslund testified:

"*Q.* You said awhile ago that was for only one purpose and that was to regulate the water-hammer?

"*A.* Yes, sir."

It is entirely clear from the testimony that what defendant was seeking, and what complainant's agent understood she was seeking, was to obtain some device in connection with the elevator which would obviate the objections of the public authorities to the installation of a hydraulic elevator using water directly from the city mains, and that the objections of the city officials and the

ordinance were founded upon a previous experience, which had resulted in substantially the very thing which resulted from the use of the water by the elevator installed by complainant.    The contract must be construed with reference to this situation, and, so construed, we think there can be no doubt of the correctness of the conclusion of the circuit judge that complainant had not complied with its contract.    While the elevator worked satisfactorily with the valve open to its full extent, the results at the pumping station and in the city mains were precisely what the city authorities had endeavored to prevent and had been assured would be prevented by the use of a pressure relief attachment.    Although, under the contract as between the parties, it was the duty of the defendant to furnish a pressure of 80 pounds to the square inch with the valve open to its full extent, still, complainant's agent fully understood that it was the city that was furnishing the water and applying the pressure.

According to the testimony of the superintendent of the water works, the normal pressure at the pumping station and in the pipes was 125 pounds, and this pressure, at no time while the water was being used at the Arlington by the elevator, fell below 80 pounds; in fact, according to his testimony, the lowest point reached was 95 pounds; and we are satisfied that, construed in the light of the surrounding circumstances and applied to the subject-matter, the contract was complied with so far as the defendant was concerned, and that complainant failed to comply with the guaranty on its part, which was the inducing cause of defendant's entering into the contract.

We think, however, that the decree entered by the court was not authorized under the pleadings in the case. The court decreed that:

"The defendants, having retained the machine, are in equity bound to pay for the same, but are entitled to recoup their damage for breach of warranty against the balance of the purchase price, $1,084.18; being the difference between the actual value of the implement sold

and what its value would have been had it been up to warranty, to wit, $885, the amount expended by defendants in purchasing and installing air pump, air tank and electric motor to bring the elevator up to the standard of efficiency set up in the agreement, and the board bill of $63 claimed in offset by the defendants; making a total of $948 to be allowed to defendants; that if complainant is dissatisfied with this amount of damages allowed to defendants, it may enter an order referring it to a circuit court commissioner or to the court to assess damages."

While our mechanic's lien law expressly provides that the owner "shall be entitled to recoup any damages which he may sustain by reason of any failure or omission in the performance of such contract" (3 Comp. Laws, § 10710), no such issue was presented by the answer. Neither did the defendants ask leave to amend the answer in this regard, nor was any such amendment ordered, as authorized by section 10736, 3 Comp. Laws. Although the defendants have not appealed and their counsel argues in support of the decree, complainant's counsel raise the point in their brief that the decree was not warranted by the pleadings, and their contention we think correct.

The decree, under the pleading and the facts as found, should have been, that the bill of complaint be dismissed, and, as so modified, the decree will be affirmed, unless, within 30 days after the filing of this opinion, complainant's counsel consent that the decree as entered in the circuit court may stand. Costs of both courts to defendants.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.